NUNC PRO TUNC OPINION
Appellant Stark County Department of Human Services (hereinafter "SCDHS") appeals the March 18, 1999 Judgment Entry entered by the Stark County Court of Common Pleas, Family Court Division, finding Fred Mangus to be a dependent child and dismissing SCDHS's complaint for neglect and abuse. Appellees are Ken and Amy Mangus, the adoptive parents of Fred Mangus.
 STATEMENT OF THE CASE AND FACTS
On December 23, 1998, SCDHS filed a complaint in the Stark County Court of Common Pleas, Family Court Division, alleging Fred Mangus to be a neglected and/or abused child. The allegations were based upon appellees' confining Fred to his bedroom for almost one year; only allowing Fred out of the room three times per day to use the restroom or not allowing the child out of his room, resulting in Fred's wetting his pants or utilizing a trash can as a commode; prohibiting Fred from having a pen or pencil in his bedroom so he was unable to do his homework; not celebrating Fred's birthday for two years; prohibiting Fred from playing with toys or other children; denying Fred access to a shower and other articles of personal hygiene; and failing to seek medical treatment for Fred's seizures. As a result of the aforementioned concerns, SCDHS assumed custody pursuant to Juv. R. 6 of Fred and several foster children placed in appellees' home. At the emergency shelter care hearing on December 23, 1998, appellees stipulated probable cause existed for the issuance of a emergency shelter care order and the placement of Fred into shelter care pending further hearing. Attorney Rosemarie Hall was appointed guardian ad litem for Fred. Via Judgment Entry filed January 22, 1999, the trial court scheduled an adjudicatory hearing for February 2, 1999, March 15, 1999, and March 16, 1999. Dr. Robin Tener, Clinical Director of Northeast Ohio Psychological Associates, testified she conducted a psychological evaluation of Fred on October 20, 1998, and thereafter, saw him for three sessions throughout the month of November. With respect to Fred's physical stature, Dr. Tener stated the boy, who is biologically eleven years old, is the size of a seven or eight year old. She further noted there was very little about Fred's appearance or demeanor which suggested his actual age. Dr. Tener detailed the sources she consulted during the course of her evaluation, explaining the information available came primarily from SCDHS. Although she sent a letter to appellees requesting to speak with them regarding Fred, and, subsequently, sent the same letter a second time by certified mail, Dr. Tener did not receive a response from appellees. SCDHS records revealed Fred was the victim of neglect early in his life. Fred had been placed in more than one relative placement, however, these placements were unsuccessful due to Fred's eating problems, which manifested itself in a gorging and vomiting cycle. The records also indicated Fred was a child who neither gave nor sought affection. He was described as distant and detached. Dr. Tener learned Fred had been placed with appellees through an association between an aunt and uncle and appellees. Fred initially entered appellees' home as a foster child, but appellees later adopted the boy. The only information Dr. Tener could gather regarding Fred's life with appellees came directly from Fred. Fred described his situation with appellees as good when he was originally placed with them. Fred's biological brother had also been placed with appellees, however, the brother was eventually moved to another placement. Thereafter, Fred's eating problems reemerged and his relationship with appellees began to break down. Fred freely admitted to Dr. Tener he would gorge himself on cookies, dry cereal and candy, actually sneaking food, and was unable to stop eating. When appellees discovered this behavior, they punished Fred, routinely confining him to his bedroom because he was not trusted in the house. Although Fred was allowed to join the family for meals, Fred essentially resided in his bedroom. Appellees installed an alarm on the door of Fred's bedroom. Fred was only permitted to use the restroom when accompanied by one of the foster children in appellees' home. Dr. Tener noted Fred expressed a great deal of confusion about why he was confined to his bedroom for such long periods of time as well as his eating problem. Fred described a very isolated home life where he was excluded from the rest of the family. The only conversations between appellees and Fred revolved around appellees' giving Fred directions. Dr. Tener explained appellees used Fred's bedroom as a place to contain him in order to make sure he did not do anything else, rather than using the room as a punishment with a time limitation. Appellees removed the majority of Fred's belongings from his bedroom. Although he shared the bedroom with other foster children, Fred was restricted from playing with their belongings and appellees would conduct periodic checks to make sure Fred did not play with the other boy's toys. Although there were some books in the bedroom, Fred was unable to interest himself with them because he is unable to read at an age appropriate level. During her assessment, Dr. Tener learned Fred was unable to read at a third grade level, could not write a comprehensible sentence and was unable to form his letters at an age appropriate level. Dr. Tener received little academic information about Fred as appellee Amy Mangus had home schooled Fred for approximately two years and Fred had only attended public school for a short time before his removal from appellees' home in October, 1998. The teachers at Parkway School in Alliance, the school Fred was attending at the time of his removal, did not seem to know him well. Additionally, due to Fred's limited time at the school, he did not have an opportunity to accomplish much academic work. When asked if Fred reported any medical problems to her, Dr. Tener replied he did not report situations in the context of medical problems, but described behaviors which resulted in appellees' punishing him. Specifically, Fred spoke about waking up in the middle of the night or waking up in the morning, covered in vomit, and not realizing he had thrown up. Fred recalled this happened on three or four occasions while he lived with appellees. Dr. Tener stated the current foster family reported at least one incident of Fred's vomiting during the night to her. Fred was ultimately referred to a neurologist. Dr. Tener described Fred as a sad, depressed child, who expressed a lot of guilt about the situation and recounted his life with a great deal of pain. Dr. Tener diagnosed Fred with reactive attachment disorder. She explained children with this disorder have very severe problems throughout their lives, and are difficult to parent and to treat. A family who is not oriented toward understanding or working with this disorder is likely to alienate the child or concoct increasingly extreme punishments to contain the inappropriate behavior, thus, compounding the child's detachment. Dr. Tener also explained children, who come from backgrounds in which they have been emotionally deprived, often experience eating disorders. When an older child experiences emotional deprivation, such as a lack of maternal bonding, the child tends to satisfy this void by eating, which is a primary experience for an infant. Food becomes a way to temporarily fill the void. Dr. Tener testified, it was her impression appellees did not provide Fred with a healthy environment in which he was emotionally supported. Dr. Tener opined Fred's increasingly restricted home life was an emotionally harmful environment for the boy. Dr. Tener also testified she conducted an assessment of Daniel Brown, a foster child in appellees' home. Attorney Jeff Jakmides, counsel for appellees, objected to the testimony on hearsay grounds. The trial court sustained the objection. Attorney Paula Sawyers, counsel for SCDHS, noted her exception for the record and asked to proffer the Dr. Tener's testimony. The trial court noted her exception and provided her an opportunity to proffer Dr. Tener's testimony as well as the testimony of Drs. Lori Brisbin-Shepler and Ann S. Hickin, who interviewed and assessed the foster children in appellees' home. Dr. Richard Darrell Steiner, an emergency room physician and the Medical Director of the Care Center at Children's Hospital Medical Center in Akron, testified he conducted a physical examination of Fred on October 14, 1998. Dr. Steiner stated SCDHS had contacted him with concerns about Fred's health and well-being. Specifically, SCDHS requested Dr. Steiner determine whether Fred's weight and growth failure were due to a medical condition. Although the results of Fred's tests revealed Fred was the weight and height of a seven and a half year old child, Dr. Steiner learned Fred did not suffer from any disease or condition. A review of Fred's medical records indicated Fred weighed forty (40) pounds on May 31, 1994, when he entered foster care. Fred weighed fifty-two (52) pounds when Dr. Steiner examined him. Dr. Steiner concluded the only cause of Fred's slow growth was inadequate caloric intake, i.e., the boy was not getting enough food to sustain his growth. When asked what the fact that Fred, five months later, currently weighed sixty point five (60.5) pounds would reveal, Dr. Steiner stated this information would indicate Fred is eating voraciously and receiving adequate amounts of food, which he was not receiving before. The doctor explained Fred's body was repairing the damage from the previous four and a half years of poor growth. Dr. Steiner noted if Fred suffered from a seizure disorder, this infirmity would not effect his weight or growth. On cross examination, Dr. Steiner stated Fred did not appear emaciated or malnourished. The doctor also testified he observed no physical signs of neglect. Dr. Steiner further explained the physical testing he conducted on Fred. The tests would reveal a genetic predisposition for shortness, however, in Fred's case, this possibility was eliminated. Dr. Steiner maintained Fred's growth rate was not fast enough. David Gibson, Daniel Brown, Jennifer Wilson, and James Wilson, foster children in appellees' home, testified regarding their observations of appellees' treatment of Fred. David Gibson, who was twelve years old at the time of the hearing, testified he shared a bedroom with Fred. David testified Fred "was in his room almost all the time. I mean, the whole day if [appellee Amy Mangus] put him in there". David explained Fred was put in the room "because he would go downstairs and take stuff out of the kitchen". David also noted Fred was only allowed to go outside "[o]nce in a great, great while". When asked if there was anything keeping Fred in the room, David stated, "The alarm on the door [Fred] didn't like it when it went off because [appellee Amy Mangus would] come up and yell at him". Fred was permitted to leave the room to eat dinner and sometimes to use the bathroom. If appellees refused to let Fred use the bathroom, he would occasionally leave the room, setting the alarm off. Appellees would yell at him and return him to his bedroom. According to David, appellees prohibited Fred from showering and did not provide him with a toothbrush. Appellees also prevented Fred from doing his homework as they refused to provide him with pencils and other school supplies. Daniel Brown, who was twelve years old at the time of the hearing, testified similarly. Daniel added Fred was not allowed to play with the other children's toys and did not have his own toys. Jennifer Wilson, eleven years old, also similarly recounted appellees' treatment of Fred. Jennifer noted she only saw Fred in the backyard playing with the other children on one or two occasions during the year she lived with appellees. James Wilson, thirteen years old, testified he shared a bedroom with Fred while he lived with appellees. James stated he observed Fred vomit during the night on at least two occasions. James recalled, on one occasion, appellees made Fred clean the aftermath and launder his own clothing and bedding. On another occasion, appellees forced Fred to remain in the vomit until the next day, when he was allowed to clean it up. To James' knowledge, appellees never took Fred to a doctor. James also observed bruises on Fred's body. Although James admitted he never saw appellees hit Fred, James stated he saw appellee Ken Mangus take Fred out of sight and, upon his return, Fred was crying. The four foster children explained they never disclosed this information to social workers, counselors, or guardians ad litem because appellee Amy Mangus had warned them not to do so, and they feared her retaliation. Rose Mary Keenan, the school psychologist for the Plain Local School System, testified she conducted an educational assessment of Fred during the later part of 1998, and the early part of 1999. Fred's teachers noticed Fred was having a difficult time with the fifth grade curriculum in math, reading, science, social studies as well as his written language skills and referred him to Keenan. Because the Plain Local School District did not receive school records which were current with respect to standardized testing, Keenan had no way of knowing Fred's ability without conducting the evaluation. The results of the assessment revealed Fred does not have a learning disability. Keenan noted, although it was difficult to establish Fred's true cognitive score because of his seizure disorder, the testing clearly established Fred lagged behind. On cross examination, Keenan would not conclude the Alliance City School System neglected Fred, but emphasized there was something awry in Fred's educational profile. On re-direct, Keenan noted, although Fred's reading comprehension appeared adequate, his word recognition and basic math skills were poor. Keenan added basic skills did not appear to be in place. Shawn McCartney, Fred's current fifth grade teacher, acknowledged Fred is able to complete his spelling, however, McCartney continued based upon Fred's overall performance in school, Fred is not functioning anywhere close to a fifth grade level. Jennifer Hostler, who investigates allegations of child abuse and neglect for SCDHS, testified she was assigned to investigate the instant matter. Hostler stated SCDHS received a hotline referral regarding Fred and the foster children in appellees' care on or about October 1, 1998. Because appellees as foster parents are technically employees of SCDHS, the Department conducted a meeting to decide the actions which would be taken in response to the referral. Thereafter, Hostler proceeded to Fred's school in order to conduct an interview with the boy. After her interview with Fred, Hostler determined SCDHS should take custody of him pursuant to Juv. R. 6. Two on-going workers proceeded to the schools of the foster children and transported them to the Children's Network, where they were separately interviewed. The children were not permitted to discuss the interviews amongst themselves. During their interviews, the foster children substantiated the concerns Fred had raised. These concerns comprise the allegations set forth in SCDHS's complaint for neglect and abuse. Kelly Murphy, a psychology assistant with Northeast Ohio Psychological Associates and Fred's current counselor, testified she has met with Fred on nine occasions since the end of December, 1998. During the two most recent sessions, Fred began to relate experiences of his life with appellees. Fred spoke positively about his taking part in family nights and being allowed to play games and Nintendo with the other children. Fred also talked positively about the times when privileges, such as going outside and playing with the other children, were returned to him. The negative experiences Fred disclosed to Murphy included his being confined to his bedroom. Murphy asked Fred why he was in his room, and Fred merely replied he did not really know, except that he was usually in trouble. When questioned further, Fred could not explain why he was usually in trouble. Fred spoke to Murphy about his feeling jealous of the other children as he watched them outside rollerblading and riding bikes while he was confined to his bedroom. Murphy added, although Fred is adjusting to his current foster home, he remains a fairly depressed child. During her cross examination, Murphy conceded Fred never specifically told her he had no toys of his own in the bedroom, but noted Fred did tell her there was nothing to do while he was in his bedroom except look out the window and watch the other children. Although Fred told Murphy he experienced episodes of vomiting during the middle of the night while living at appellees' home, he denied having any seizures during that time. Murphy noted her belief Fred did not have an understanding of what it means to have a seizure. Diane Witham, an intermediate language arts teacher at Parkway Elementary School in Alliance, testified she had the opportunity to work with Fred at the beginning of the 1998 academic year. Witham characterized Fred's academic performance as low to average. At the point in which Fred was removed from appellees' home, Witham stated she had not yet determined whether Fred needed to be reassessed, explaining they were only six to eight weeks into the new school year. On cross examination, Witham stated she never noticed a problem with Fred's personal hygiene. Jennifer Palla-Hamilton, the SCDHS on-going family service worker assigned to appellees' family, testified she has not had any contact with appellees since November, 1998, when she was assigned to the case. Palla-Hamilton explained SCDHS's legal department informed her Attorney Jakmides requested no Department staff contact appellees without going through him. On March 12, 1999, Palla-Hamilton weighed Fred in order to ascertain how much weight he had gained while in his current foster home. Fred weighed 60.5 pounds on that day. Palla-Hamilton noted, although Fred suffered three seizures when he was initially placed in his current foster home, he had been placed on medication to control the seizures and had not suffered any since that time. Palla-Hamilton believed Fred had been diagnosed with a general seizure disorder. Julie Poyser, a teacher at Parkway School, testified on appellees' behalf. Poyser stated Fred was one of her students and she never observed any signs indicating his education was neglected at appellees' home. On cross exam, Poyser admitted Fred did not always arrive to school with his homework prepared. She stated Fred told another teacher he was unable to complete his assignments at home. Poyser also acknowledged Fred was below level in some areas of his education, and he was having difficulty in her class, science. Amy Caseline, the guardian ad litem for Jessica Bandy, also testified on behalf of appellees. During the two and one half years Jessica resided with appellees, Caseline visited appellees' home an average of two times per week. Caseline stated she never had any concerns with respect to the care Jessica was receiving from appellees, and noted the guardians of the other children never expressed to her any concerns they had about the care their children were receiving from appellees. When asked about the allegations in SCDHS's complaint, Caseline responded such allegations could not be true because she personally observed Fred outside during her visits to appellees' home. Additionally, she observed Fred playing with toys, at different functions with the family, and in her own home. Caseline further stated she witnessed appellee Amy Mangus working with Fred on his homework. On cross examination, Caseline acknowledged the existence of an alarm on the door of Fred's bedroom and admitted appellees sent Fred to his room as punishment. However, Caseline believed to say Fred was "kept" in his room would not be fair because there was nothing restraining him. She explained she is the guardian for other children who have alarms on their doors and such devices do not keep them restrained in their rooms. Caseline admitted Fred is a very introverted child who could view the alarm as a restraint, keeping him in his room. Caseline conceded she has built a friendship with appellee Amy and the two are good friends. When asked whether she observed Fred in his room during a birthday party in February, 1998, Caseline testified she saw him in his room but he was playing with other children. Caseline confessed she had no idea what concerns Fred and the foster children raised about appellees. On redirect, Caseline again reiterated the allegations in the complaint were not true and appellees provided a good home for Fred. Karen Nelson, appellees' next door neighbor, testified she had over twenty years experience in the social services field. Nelson described appellees as very family oriented people, stating everything appellees did was done as a family and with the entire family. When asked specifically about Fred, Nelson testified she often saw him outside, playing with appellees' biological children, rollerblading in the backyard, and doing chores. Nelson expressed no concerns over the way appellee Amy Mangus ran the home. On cross examination, Nelson admitted she never spent any "sit down" time with appellees, but noted she saw appellee Amy Mangus outside "a lot with the kids." Nelson stated she is actually in appellees' home three to four times per month, however, she noted such visits were generally very brief. Nelson could not specify how much time she spent talking to appellees when she saw them outside, explaining the length of the conversation depended upon what else was going on. Helen Stavrakis, Director of the Volunteer Guardian Ad Litem Program for Family Court, testified regarding her contact with the guardians ad litem and social workers for the foster children in appellees' care. Prior to Fred's case being brought into court, Stavrakis never heard anything negative about appellees. She did not have an impression as to how appellees were caring for Fred as the one time she actually visited the home, she did not meet Fred. Stavrakis described appellees as extremely organized on the day she visited the home. During that visit, she had conversations with at least three of the children involved in the guardian ad litem program. She stated the children seemed very happy and content. She noted the visit lasted an hour and a half. Stavrakis reiterated the guardians involved with appellees never reported anything negative about the care appellees provided to the foster children. Suzanne Short, a social worker with SCDHS, testified she works as a home finder and had worked with appellees in the past. Although guidelines for foster homes limit the number the foster children in a home to five, Short stated appellees violated this rule by court order when a sixth child was placed in their home. SCDHS objected to the court's decision at that time. Short testified she never received a complaint regarding neglect or abuse of any of the children in appellees' home, but noted appellees did have rule violations. On cross examination, Short explained appellees had rule violations prior to her involvement with them as well as when she first became involved with them in the fall of 1997. The violation involved a six year old boy in appellees' care who had been denied bedding and was sleeping on the floor without blankets, pillows, and pajamas. Through SCDHS's investigation relative to Fred, Short learned of other rule violations committed by appellees. Specifically, appellees used food as a means of discipline for the foster children, a practice which is against Ohio Department Health Services rules. Additionally, appellees treated the foster children differently from their biological children, maintaining different rules for and granting different privileges to the two groups of children. On redirect, Short acknowledged the six year old boy was not removed from appellees' care. In the time period in which she worked with appellees, Short never filed any form of complaint against them for abuse or neglect. Alan Mangus, appellees' eldest child, testified regarding his relationship with Fred as well as his observations of appellees' treatment of Fred. Alan stated he and his brothers and sister treated Fred as part of the family, "like any other sibling." Alan further testified there was never a time when he was concerned appellees were not caring for Fred. When asked specifically about the allegations in the complaint, Alan responded Fred was never prevented from doing his homework and he often saw Fred studying. Although Alan observed Fred in his bedroom, the teenager maintained Fred was never kept in his room. Alan noted Fred had his own toys, received toys at Christmas, and the family celebrated Fred's birthday. Alan added Fred bathed on a regular basis and owned a toothbrush. Alan maintained the allegations against appellees were untrue. On cross examination, Alan stated he is a busy student, involved in a lot of extracurricular activities. Alan testified he wakes up around 7:00 a.m. for school and arrives home around 3:30 p.m. During football season, Alan does not return home until 6:30 p.m. The games are played on Friday nights and he spends Saturday nights with his girlfriend. Additionally, Alan works part-time during the summer. Alan stated his bedroom is in the basement of the house and Fred's bedroom is on the second floor. At the close of the case, appellees moved the trial court to dismiss the complaint. On the record, the court found SCDHS failed to prove the allegations of neglect and abuse as set forth in the complaint. The trial court sustained appellees' motion and dismissed the complaint with respect to the allegations of neglect and abuse. However, the court found Fred to be a dependent child based upon the evidence presented and the stipulation offered by appellees. The trial court memorialized its findings and dismissal of the complaint for neglect and abuse via Judgment Entry filed March 19, 1999. It is from this judgment entry SCDHS appeals, raising the following assignments of error:
 I. THE COURT ERRED AS A MATTER OF LAW IN RULING THAT THE TESTIMONY OF DR. ROBIN TENER, DR. ANN HICKENS AND DR. LORI BRISBIN-SHEPLAR [SIC] REGARDING THE PSYCHOLOGICAL EVALUATIONS OF DAVID GIBSON, DANIEL BROWN, JAMES WILSON, JENNIFER WILSON AND JESSICA BANDY WAS INADMISSIBLE HEARSAY.
 II. THE COURT ERRED AS A MATTER OF LAW IN DISMISSING THE COMPLAINT YET ENTERING A FINDING OF DEPENDENCY AT THE CLOSE OF THE STATE'S CASE.
 III. THE COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN FINDING PROSECUTORIAL MISCONDUCT AND PERSECUTION OF THE FOSTER PARENTS BY THE STARK COUNTY DEPARTMENT OF HUMAN SERVICES.
 IV. THE COURT'S DISMISSAL AND CONCURRENT FINDINGS OF DEPENDENCY, PROSECUTORIAL MISCONDUCT AND PERSECUTION WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
 I
In their first assignment of error, SCDHS maintains the trial court erred in ruling the testimony of Dr. Robin Tener, Dr. Ann Hickens, and Dr. Lori Brisbin-Shepler regarding the psychological evaluations of appellees' foster children was inadmissible hearsay. The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173. Therefore, we will not disturb a trial court's evidentiary ruling unless we find said ruling to be an abuse of discretion; i.e. unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. State v. Adams (1980), 62 Ohio St.2d 151, 157. During Dr. Tener's direct examination, SCDHS attempted to adduce testimony regarding her assessment of Daniel Brown, a foster child in appellees' care at the time of Fred's removal. Dr. Tener explained the purpose for evaluating Daniel was to determine whether the focus of his therapy needed to be different as a result of the events which occurred while he was living with appellees. Appellees objected to the testimony on hearsay grounds. SCDHS countered the testimony was admissible under the hearsay exception for statements made for purposes of medical diagnosis or treatment. The trial court agreed with appellees and sustained the objection. Prior to the presentation of evidence on the second day of the hearing, the parties discussed the witnesses each intended to call and the amount of time necessary for the testimony. Attorney Sawyers indicated she intended to call Drs. Lori Brisbin-Shepler and Ann Hickin, psychologists who work with Dr. Tener and conducted evaluations of the foster children. Appellees stated the testimony of these witnesses was, like the testimony of Dr. Tener relative to her assessment of Daniel Brown, inadmissible hearsay. The trial court instructed SCDHS to call off Drs. Brisbin-Shepler and Hickin. At the close of all the evidence, SCDHS offered Exhibit 6, a report prepared by Drs. Tener, Brisbin-Shepler, and Hickin regarding the five foster children in appellees' care, into evidence. SCDHS requested the trial court view Exhibit 6 as a proffer in writing of the testimony of the three witnesses. Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." SCDHS does not dispute the testimony of the foster children's psychologists is hearsay, however, SCDHS maintains the statements fall within the exception to the hearsay rule provided in Evid.R. 803(4): Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
In order for hearsay to be admitted under Evid.R. 803(4), such statements must have an "indicia of reliability". State v. Boston (1989), 46 Ohio St.3d 108, 127. We agree the testimony of the psychologists relating the statements made by the foster children during their psychological evaluations are hearsay, and find such statements may fall within the hearsay exception under Evid.R. 803(4). See, e.g., State v. Kelly (1994), 93 Ohio App.3d 257. However, given the age of the foster children at the time the statements were made (between 11 and 13 years old) and the fact the psychologists are not medical doctors, we find the trial court did not abuse its discretion in finding the psychologists testimony did not fall within the hearsay exception under Evid.R. 803(4) as the statements may have lacked an "indicia of reliability". Furthermore and more importantly, assuming, arguendo, the trial court erred in failing to admit the testimony, we find such error to be harmless because upon our review of the substance of the testimony revealed in SCDHS's proffered report, such evidence was essentially cumulative to the evidence produced at trial. SCDHS's first assignment of error is overruled.
 II, IV
In these assignments of error, SCDHS claims the trial court erred in dismissing the complaint for neglect and abuse and simultaneously entering a finding of dependency. SCDHS claims the trial court's decision was against the manifest weight of the evidence. We are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, unreported. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. (1978), 54 Ohio St.2d 279. SCDHS's complaint alleged Fred to be a neglected child as defined in R.C. 2151.03(A)(2) and (3), which provides: (A) As used in this chapter, "neglected child" includes any child:
* * *
 (2) Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian;
 (3) Whose parents, guardian, or custodian neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;
The complaint further alleged Fred to be an abused child as defined in R.C. 2151.031(D), which provides: As used in this chapter, an "abused child" includes any child who:
* * *
 (D) Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare.
Upon our review of the record in this matter and a thorough reading of the entire transcript of the adjudicatory hearing, we find the trial court's finding Fred was not a neglected and/or abused child to be against the manifest weight of the evidence. Although we have recounted the testimony presented at the adjudicatory hearing in great detail in our Statement of Facts and Case, we shall highlight the evidence which we find germane to our ruling. Dr. Robin Tener, who conducted a psychological assessment of Fred shortly after his removal from appellees' home, testified regarding the information she obtained during her evaluation and how this information supports her diagnosis of Fred with reactive detachment disorder. Despite Dr. Tener's request, appellees did not meet with her to discuss Fred. Dr. Tener learned Fred suffers from an eating disorder in which he sneaks food, gorges himself, and then vomits as a result of that behavior. Dr. Tener explained such eating disorders often appear in children who have suffered from severe deprivation in their lives, including emotional deprivation. These children try to satisfy an emotional void with food. Although Fred experienced neglect early on in his life, appellees' failure to provide an emotionally supportive environment magnified Fred's problems. Fred described an isolated and restricted life with appellees, which included punishments which often did not have an end, exclusion from family activities, and confinement in his bedroom, only being allowed downstairs for meals and occasionally to use the restroom. During her assessment, Dr. Tener learned of Fred's academic deficiencies. She noted Fred, a fifth grader, was unable to read at a third grade level and could not form his letters at an age appropriate level. Appellee Amy Mangus had home schooled Fred for approximately two years. The Parkway School in Alliance had limited information about Fred due to the brief amount of time he was enrolled in the District. Fred also informed Dr. Tener about incidents when he would wake up in the morning, covered in vomit, and not realizing he had thrown up during the middle of the night. Such incidents would result in appellees' punishing Fred, but never seeking medical attention for him. Fred has since been diagnosed with a seizure disorder, which is controlled through medication. Dr. Steiner, who conducted a physical examination of Fred shortly after the boy's removal from appellees' home, testified Fred's weight and growth failure while he was residing with appellees was not the result of a medical disease or condition, but rather the result of the child being deprived calories. Between May, 1994, when Fred entered foster care, and October, 1998, when he was removed from appellees' home, Fred gained only 12 pounds. However, between October, 1998, and March, 1999, Fred had gained 8.5 pounds. Dr. Steiner stated this rapid weight gain indicated the child was presently eating in a voracious manner and receiving adequate amounts of food. David Gibson, Daniel Brown, Jennifer Wilson, and James Wilson, appellees' foster children, all similarly testified about appellees' treatment of Fred. They recalled Fred's being continually kept in his bedroom, which had an alarm on the door; being prohibited from playing outside with the other children; not being allowed to play with any toys; and, as a general rule, being excluded from family activities. David, Daniel, and James shared a bedroom with Fred. Rose Mary Keenan, who conducted an educational assessment of Fred, testified the tests disclosed Fred does not suffer from a learning disability, but clearly established he lags behind, unable to perform at an age appropriate level. Essentially, Fred did not exhibit basic skills in core subject areas. Shawn McCartney, Fred's current teacher, reiterated Fred's inability to function at grade level. Kelly Murphy, Fred's current counselor, testified regarding Fred's revelations to her about his life with appellees. Her testimony paralleled the testimony of Dr. Tener and the foster children. Fred described being confined to his room because he was in trouble, but could not explain what behaviors caused appellees to inflict this punishment upon him. Fred confessed his jealousy of the other children who were permitted to play outside. Like Dr. Tener, Murphy described Fred as a sad, depressed child. Appellees called numerous witnesses on their behalf, all of whom testified contrary to SCDHS's witnesses. However, we find the limited exposure most of these witnesses had with Fred provided them with an incomplete picture of the boy's daily life with appellees. Julie Poyser, Fred's former science teacher, had only taught the boy for approximately six weeks when he was removed from appellees' home. She testified she never observed any signs indicating Fred's education was being neglected, but acknowledged Fred performed below academic level. Poyser also admitted Fred did not always arrive to school with his homework prepared. Helen Stravrakis positively testified on appellees' behalf, stating she never received any negative reports about appellees from the guardians ad litem working with the family. However, Stravrakis herself had only visited appellees' home on one occasion and did not meet or see Fred during that visit. Karen Nelson described appellees as family oriented people who did everything as and with the family. Nelson stated she observed Fred outside, playing with the other children and doing chores. Although Nelson expressed no concerns about the manner in which appellee Amy Mangus ran the household, she admitted she did not spend any substantial time actually in appellees' home. Appellees' strongest witnesses were Amy Caseline and Alan Mangus. Caseline testified she never observed any maltreatment of Fred by appellees. Caseline maintained the allegations in SCDHS's complaint were untrue as such were antithetical to her personal experiences with the family and with Fred. Caseline visits appellees at least twice a week. On cross examination, Caseline acknowledged the existence of the alarm on Fred's bedroom door. She also conceded Fred's introverted personality might cause him to view the alarm as a restraint. We view Caseline's testimony with caution due to her bias, which was revealed when she admitted her close relationship with appellee Amy Mangus. Alan Mangus positively testified about his personal relationship with Fred and his observation of appellees' treatment of Fred. Evident from the testimony adduced during Alan's cross examination is the fact his extracurricular activities and social life decreased his exposure to Fred. In contrast, the foster children were with Fred on a day to day basis for a more appreciable amount of time. While we recognize a trier of fact is free to accept or reject any or all the testimony of a witness or witnesses and is in the best position to assess the credibility of those witnesses, we find the evidence supporting a finding of neglect and abuse was more substantial and more probative than the evidence supporting a finding to the contrary. Accordingly, we find the trial court's finding Fred was not a neglected and/or abused child to be against the manifest weight of the evidence. SCDHS's second and fourth assignments of error are sustained.
 III
In their third assignment of error, SCDHS asserts the trial court erred and abused its discretion in finding prosecutorial misconduct and in finding the proceedings to be a persecution of appellees by SCDHS. Specifically, SCDHS takes issue with the following: This case was obviously prosecuted in part due to the personal animosity between counsel which was often displayed in the Court's presence. It also appears to be a persecution by SCDHS of these foster parents. While the court is dismayed and puzzled at this spectacle, these factors played absolutely no role in the Court's findings below.
March 19, 1999 Judgment Entry.
This statement appears within the "Findings of Fact" section of the March 19, 1999 Judgment Entry. However, we find such placement does not mean the statement is actually a factual finding. In other words, this expression by the trial court of its personal opinion is not transformed into a factual finding relative to the instant matter merely because the statement is set forth under the "Findings of Fact" section of the judgment entry. Because we do not find the statement to be a factual finding, but rather an expression of the trial court's personal opinion, we overrule SCDHS's third assignment of error. We hasten to add, our overruling of SCDHS's assignment of error should in no way be construed as a concurrence by this Court in the trial court's personal opinion. Additionally, we believe the subject expression of the trial court's personal opinion in its judgment entry to be not only unnecessary, but also inappropriate, particularly in light of the trial court's disclaimer such opinion played absolutely no role in its findings. SCDHS's third assignment of error is overruled. The judgment entry of the Stark County Court of Common Pleas, Family Court Division, is affirmed in part and reversed in part and the matter remanded to the trial court for further proceedings consistent with law and this opinion.
By Farmer, J. and Edwards, J. concur Hoffman, P.J. dissents.